UNITED STATES of America

v.

Ronald George THOMPKINS, Defendant.

No. 75 Cr. 703.

United States District Court, S. D. New York.

Dec. 23, 1975.

Thomas J. Cahill, U. S. Atty., S. D. N. Y., New York City, Michael S. Devorkin, Asst. U. S. Atty., for plaintiff.

Joseph I. Stone, New York City, for defendant Ronald George Thompkins.

## MEMORANDUM

LASKER, District Judge.

By memorandum dated November 17, 1975 we granted the defendant's motion to suppress an envelope seized at the scene of arrest. Claiming that the decision was based on an "incorrect factual premise," the government now moves to reargue.

██ The government correctly observes that a key element in the decision to suppress was the conclusion that Officer Maffia knew that the hard object he felt in the defendant's jacket pocket was a comb before he withdrew the comb and envelope from the pocket. We held that while the officer

"may have been justified in inspecting the suspect's jacket, feeling for hard objects and looking into a pocket upon feeling one such hard object, he had no right, once he had satisfied himself that the object was a comb, to proceed further and empty the contents." Memorandum Opinion 403 F.Supp. 350, at 352.

The government suggests that this factual determination is contradicted by the record; that although Maffia did first look into the pocket and see the comb, "there is no evidence that he concluded the comb was *the* hard object he felt inside the pocket." (Devorkin Affidavit, ¶ 3) We cannot agree.

Maffia testified that upon picking up the jacket, he felt "an object" in the inside right breast pocket. (Tr. 24) His testimony about this discovery was repeatedly and consistently in the singular (Tr. 24; 41–46) and we conclude that he felt one, and only one, hard object in the pocket.

On cross examination, counsel for the defendant attempted to elicit from the officer what precautions he took against the danger of reaching into the pocket and discharging a weapon due to ignorance of the size, nature or position of the hard object. Maffia conceded that he first looked into the pocket and concluded that the hard object was not a gun before putting his hand in the pocket. (Tr. 42) When the officer then testified that he removed both the envelope and the comb at the same time, the following colloquy occurred:

"Q: Before [the envelope] even came out, you already knew that the comb was a comb and not a gun?

A: Yes."

The officer then volunteered that as a matter of routine precaution, he "take[s] what [he] can" out of the pocket and then searches further to be sure it is empty. (Tr. 43–44)

On redirect the government first attempted to show that Maffia recognized the hard object to be a comb only as he was removing it (Tr. 44) but it became clear that this was simply not the case. On questioning by the court, Maffia reiterated that he saw the envelope and the comb before removing both. (Tr. 44–46) The court thereupon inquired if this was done to see if there was anything else

and Maffia said it was. (Tr. 45) It was in the context of this inquiry that the exchange partially quoted by the government in its moving papers took place.

> "THE COURT: When you went with your finger like that, approximately like that, by that time or immediately thereafter, immediately after that time you did see the envelope and the comb?
>
> THE WITNESS: Yes.
>
> THE COURT: Am I to understand you to mean you weren't sure that the comb constituted the sole object in the pocket?
>
> THE WITNESS: That's correct." (Tr. 45–46)

Taken as a whole the record amply supports the earlier conclusion that Maffia felt a hard object, opened the pocket with a finger, saw that the object was a 5–7 inch "fro comb" and then removed both the comb and the envelope, whereupon he discovered the damning inscription. (Op. at 2) It is particularly significant that Maffia consistently testified in the singular about the hard object he felt, and that only on redirect, after defense counsel elicited the damaging concession that he knew the object was a comb and not a gun before removing both, did he testify that he searched further to be sure the pocket was empty. Indeed, the court's question which prompted elaboration on this point would not have been asked but for the inherent confusion between Maffia's testimony on direct and cross on the one hand, and redirect on the other, and we are not bound by his answer to our query, which, after all, simply provided a way out of an uncomfortable spot.

The government's assertion that Maffia "could not possibly have known from feeling the outside of a pocket whether the comb he saw was the only item which constituted the hard object he felt," (Devorkin Affidavit, ¶ 4) is contrary to common sense. We can take judicial notice both of the limited capacity of inside suit jacket pockets and that it is eminently feasible by feeling such a pocket to determine the number and nature of objects contained, at least for the limited purpose of a protective search.

The search was conducted by Maffia while the two suspects were being held at gunpoint by two other police officers a few feet away. In the absence of probable cause, as was the case, its scope was strictly limited to that reasonably required to assure the officer of his personal safety during his investigation. *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1973). Writing in another context, Judge Oakes has summarized the *Terry-Adams* holdings as follows:

> "[I]t is, and indeed for preservation of a free society must be, a *constitutional requirement that to be reasonable the search must be as limited as possible commensurate with the performance of its functions.*" *United States v. Albarado,* 495 F.2d 799, 806 (2d Cir. 1974) (emphasis in the original).

We adhere to our original conclusion that Maffia exceeded this limit. To sustain the search would be to open wide the door to the danger so well stated by Judge Friendly that:

> "instead of the stop being the object and the protective frisk an incident thereto, the reverse will be true." *Williams v. Adams,* 436 F.2d 30, 38 (2d Cir. 1971) (Friendly, J., dissenting), *rev'd en banc,* 441 F.2d 394 (2d Cir. 1971), *rev'd sub nom., Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

■ The government's two other grounds for questioning our decision can be disposed of more readily. It is argued that under the holding in *United States v. Bell,* 464 F.2d 667 (2d Cir. 1973) Maffia could have ordered the defendant to remove the object himself, and had he done so Maffia would have observed the note on the envelope. It is not at all clear, in the first place, that *Bell* grants such authority in the circumstances of this case. That case involved the permissible scope of routine airport searches conducted to prevent hijacking, a ques-

tion which presents unique Fourth Amendment considerations distinguishable in many respects from more ordinary confrontations between citizens and police. See, e. g., the court's opinions in *Bell, United States v. Albarado, supra,* and *United States v. Reid,* 351 F.Supp. 714, 717 n. 10 (E.D.N.Y.1972). (Even in the airport cases, appellate courts have strictly applied the *Terry-Adams* rationale to prevent searches which exceed the minimum scope required to guard effectively against air piracy. See *United States v. Kroll,* 481 F.2d 884, 886–87 (8th Cir. 1973), cited with approval in *United States v. Albarado, supra,* 495 F.2d at 810.) Moreover that Maffia would inevitably have discovered the note if Thompkins removed the envelope himself is pure conjecture.

 Finally, the government asks us to reconsider our determination that probable cause did not exist when the defendants were first approached. It has appended forty pages of a transcript from a suppression hearing in *United States v. Diggs,* 73 Cr. 816, held before Judge Pollack on October 29, 1973. We have read the transcript with care and conclude that that case is distinguishable on its facts from this one.[1] In *Diggs* the officers did observe three men in a pattern of suspicious behavior similar to that of Thompkins and Taylor, but in that case, the officers waited until the defendant had committed far more compromising acts before closing in. They observed the three make a final approach to the bank, saw one enter, one take a position by the door and the third, Diggs, wait outside at a taxi stand. At a signal from the man at the door, Diggs attempted to hail a cab. Unsuccessful, Diggs proceeded away from the vicinity on foot and as the officers started to follow him in their car, they heard police sirens and saw squad cars converging in front of the bank. (Tr. 10–12) Only then, the officer testified, did he decide to stop the suspect. (Tr. 13) On these facts Judge Pollack found probable cause, (Tr. 58–60) although his decision to suppress statements given by Diggs when he was first accosted by the officers indicates that he may actually have found only reasonable suspicion at that point. Whatever the precise legal rationale, Judge Pollack's decision has no bearing on the facts here. Thompkins and Taylor were stopped much earlier in the chain of events. Nothing in the transcript indicates that a similar decision would have been made had Diggs been stopped as he was waiting at the taxi stand, or, even more close to the facts here, as he and his friends were holding their final caucus before entering the bank.

The motion to reargue is granted and upon reconsideration, we adhere to our prior decision.

It is so ordered.

---

1. Even if it were not, we of course are not bound by the determination in *Diggs,* as the finding of probable cause was not before the court which affirmed the conviction on appeal.

*United States v. Diggs,* 497 F.2d 391 (2d Cir.), *cert. denied,* 419 U.S. 86, 95 S.Ct. 112, 42 L.Ed.2d 96 (1974).