UNITED STATES of America,

v.

Donald HEAD, a/k/a "Mr. Don" et al., Defendants.

No. 76 Crim. 295–LFM.

United States District Court, S. D. New York.

May 5, 1976.

Irving G. Perl, New York City, for defendant Head.

Robert B. Fiske, Jr., U. S. Atty., S. D. of N. Y., New York City, by Federico E. Virella, Jr., Asst. U. S. Atty., New York City, for United States.

OPINION

MacMAHON, District Judge.

Defendant Head moves to suppress and exclude from introduction into evidence a package containing $26,800 in currency, taken from his possession in the office of his commanding officer, Captain Robert Roberts, USAF, in Don Muang Air Base, Thailand, and all testimony relating to its seizure and contents.

It appears from an evidentiary hearing, held May 3, 1976, that agents of the Drug Enforcement Administration (DEA) and the Office of Special Investigations (OSI) learned of facts indicating that a member of the United States Air Force, stationed at the postal facility at the American air terminal, Don Muang Air Base, Thailand, was trafficking in narcotics between Thailand and the United States through the mail.

On March 9, 1976, Special Agent Kerr of OSI, seeking to identify the individual involved, furnished Roberts with a description of the suspect, and Roberts concluded that Head matched the description.

Learning, on March 9 or 10, that a registered package addressed to Head had arrived at the postal facility, Roberts caused the package to be fluoroscoped, and he observed from the image on the screen that it appeared to contain stacks of currency. Two assistants also made the same observation and came to the same conclusion. Roberts then advised Kerr of what he had discovered.

Early on the morning of March 11, 1976, Special Agent Maher of DEA learned that a complaint and arrest warrant against Head had been issued by a United States Magistrate for the Southern District of New York. On the same day, at approximately 11:00 A.M., Roberts caused a telephone call to be made to the home of Head, located in downtown Bangkok, to instruct him to come to the air base in order to complete processing for transfer back to the United States because Head's "hitch" in Thailand was soon to end.

On the same day, at about 3:00 P.M., Head, accompanied by his infant daughter, reported to Roberts' office at the air base, where Roberts told him to complete his processing, pick up his mail, and return to the office. Head left and shortly thereafter returned to Roberts' office.

Head was then placed under arrest by two Air Force security police, who took a blue vinyl shoulder bag from him, in the presence of Roberts, Kerr and Maher. Head's daughter then began to cry, and Head asked Maher to open the shoulder bag and take out a bottle of milk to pacify the child. As he did, Maher noticed the unopened package in the bag. Soon thereafter, Head and the unopened package were taken from the air base to the OSI office in Bangkok.

There, Special Agent Oak of OSI, at Kerr's request, sought authorization from the commanding officer to open and search the package. Kerr was informed, at ap-

proximately 5:00 P.M., that a search of the package had been authorized by Colonel Howard F. O'Neal, Commanding Officer of the 635th Combat Support Group at Utapao Air Base. The package was then opened and the contents—$26,800 in United States currency—seized.

Defendant Head moves to suppress the package, the $26,800 contained in it, and all testimony relating to its seizure on the grounds that fluoroscoping the package and/or seizing and opening it subsequent to his arrest, were illegal and in violation of the Fourth Amendment. The motion is denied.

■ The Fourth Amendment applies to matter moving through the mail,[1] but it only proscribes searches and seizures which are "unreasonable." We find that neither the fluoroscoping of the package nor its opening after Head's arrest was an unreasonable search.

The air terminal where the package was received and fluoroscoped was directed and managed by the Air Force under the authority of Title 39, United States Code, Section 406, which provides that the postal service may establish branch offices on defense installations (§ 406(a)) and that these branches may be manned by armed services or other personnel (§ 406(b)).

The Air Force, implementing this authority, has issued a comprehensive manual entitled "Postal Service—Responsibilities and Procedures (January 28, 1973)." Section 14–3 of the manual covers "examination of personal mail." Subsection (c) of § 14–3 provides:

"Fluoroscope and other detection equipment will be used by military postal personnel as directed by the military department which operates the military post office."

And subsection (i) of § 14–3 provides, in part:

"Merchandise mailed as personal mail from military post offices into the customs territory of the United States is subject to customs examination."

The air terminal at Don Muang is a clearing house for all incoming and outgoing mail for United States military and government personnel assigned to Thailand. The package addressed to defendant Head had been sent from Washington, D. C. Thus, the package had crossed international boundaries and was fluoroscoped shortly after its arrival in Thailand.

The courts have frequently underlined the distinction between searches conducted within the boundaries of the United States and those occurring at a port of entry.[2] It has been held that searches by customs officials need not be supported by a search warrant or be based upon probable cause.[3]

■ Indeed, in this area, the only restriction which the Fourth Amendment superimposes is that the search be reasonable under the circumstances. The rationale of the distinction between internal and international searches is that the purpose of the latter is not to apprehend persons, but to prevent the introduction or exportation of contraband.[4]

■ It has been held that customs inspection of international mail at a post office is permissible because the post office is considered a port of entry in that circumstance,[5] and in *People v. Kosoff*, 34 Cal.App.3d 920, 110 Cal.Rptr. 391 (Ct.Apps., 2d Dist. 1973), the court held that packages, sent by military personnel in southeast Asia to the United States through military post offices, are not exempt from customs searches. No greater rights can exist mere-

---

1. *Ex parte Jackson*, 96 U.S. 727, 24 L.Ed. 877 (1877).

2. See *Carroll v. United States*, 267 U.S. 132, 151–152, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

3. *United States v. Ortega*, 471 F.2d 1350, 1360 (2d Cir. 1972), *cert. denied*, 411 U.S. 949, 93 S.Ct. 1925, 36 L.Ed.2d 409 (1973); *United States v. Glaziou*, 402 F.2d 8, 12 (2d Cir. 1968),

cert. denied, 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969).

4. *Carroll v. United States, supra.*

5. See *United States v. Swede*, 326 F.Supp. 533 (S.D.N.Y.1971); *United States v. Sohnen*, 298 F.Supp. 51 (E.D.N.Y.1969).

ly because a package travels the opposite route, that is, when it is mailed from the United States to a military post office overseas.

 Thus, the package was subject to a reasonable search upon its arrival at the air base in Thailand, and, under the facts shown here, the fluoroscoping of the package was eminently reasonable because the only purpose of the limited intrusion involved was to detect contraband and not to violate the "sanctity" of any personal correspondence. In addition, we deal here with a United States military installation, far from our own shores, in a country where the presence of our military is a tense political issue. Under all of these circumstances, we cannot say that the fluoroscope examination was an unreasonable search.

There is another ground for sustaining the fluoroscope examination of the package. The Air Force, mindful that its mail facilities present a facile means for transporting contraband, has established an anticontraband program designed to deter those using the mails from trafficking in illegal commodities. Several regulations have been promulgated to implement this program. These regulations prohibit the opening of first or a higher class of mail (such as registered mail), but expressly require that these items be fluoroscoped.

The regulations also require that the existence of this program be widely advertised among military personnel and that the fluoroscope machine be placed where it is likely to be seen by as many individuals as possible. The obvious purpose of these regulations is to deter anyone from using the Air Force mails to ship contraband in the first place.

It is well settled that the Fourth Amendment applies to "zones of privacy," that is, areas in which an individual has a reasonable expectation that governmental forces will not intrude.[6]

In the present case, defendant Head, who worked at the air mail terminal as a super-visor, must have been aware of the anticontraband program and the use of the fluoroscope. He must then have been aware that any package mailed to him was subject to such an examination. This is similar to *United States v. Hall*, 488 F.2d 193 (9th Cir. 1973), where the court held that the defendant, who made incriminating statements over his automobile radio-telephone, although he knew that these conversations were subject to interception by anyone else with such a device, could not complain that these statements were in fact overheard since he did not justifiably rely upon his privacy.

In addition, the use of the fluoroscope in this case may be analogized to the use of a magnetometer at an airport, through which passengers must walk prior to boarding an airplane. In *United States v. Albarado*, 495 F.2d 799 (2d Cir. 1974), the Second Circuit upheld the use of magnetometers, not on the basis of implied consent, but because the search involved is reasonable under the circumstances. The court emphasized that the safety factor in preventing skyjackings was important and that the limited intrusion involved did not result in any indignity or social stigma to the individual who activates the machine, since a small amount of metal is sufficient. Balancing the interests involved, the court upheld the use of such devices.[7]

In the present case, such a balancing of interests mandates that we uphold the fluoroscope examination of the package. The international trafficking in drugs presents serious dangers to all our citizenry, and drug trafficking in a United States military zone, located in a foreign country, poses a grave threat to the health and efficacy of our troops and, in turn, the security and ultimate survival of our country. Surely, those dangers are as real as that presented to airline passengers posed by concealed weapons aboard an airplane. The privacy of an individual's correspondence was not violated here because the fluoroscope reveals only an outline of the contents of the

---

6. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

7. Compare *United States v. Bronstein*, 521 F.2d 459 (2d Cir. 1975).

package, not legible words of a letter. As with the magnetometer, the search is extremely limited and commensurate with the performance of its justifiable function.[8]

We conclude, therefore, that the fluoroscoping of the package did not violate defendant Head's Fourth Amendment rights.

We turn now to the seizure and opening of the package subsequent to Head's arrest.

Article 36 of the Uniform Code of Military Justice, 10 U.S.C. § 836(a), explicitly authorizes the president to prescribe rules concerning the procedures to be used in military criminal matters. The Manual for Courts-Martial of the United States was promulgated in 1969 under this authorization. Chapter 152 of the manual provides that a search may be authorized by a commanding officer upon a showing of probable cause in certain situations, including "a search of property owned, used, or occupied by, or in the possession of, a person subject to military law . . . to property being situated in a military installation, encampment, or vessel or some other place under military control or situated in occupied territory or a foreign country."

■ Defendant Head does not contend that the authorization was issued without probable cause. The issuance by the commanding officer of authorization to seize in this case was thus entirely proper. Indeed, such a procedure was, in the factual context of this case, totally necessary since recourse to a federal magistrate or state judge under Rule 41 of the Federal Rules of Criminal Procedure was a logistical impossibility.

Colonel O'Neal was the commanding officer to whom the postal personnel at Don Muang had turned previously for search authorizations. In this case, he acted as a detached, impartial magistrate, a role which

Captain Roberts, Head's immediate supervisor, might not have been able to fill.[9]

■ Furthermore, the fact that the authorization was not based on a written affidavit of Special Agent Oak or another agent is immaterial. Nor is it material that the commanding officer's authorization was not reduced to writing until after the search. The courts construing the authorization procedure have uniformly concluded that neither a written application nor a written authorization is necessary.[10]

■ In addition, this search occurred as an incident to Head's lawful arrest and, therefore, must be upheld.[11]

Accordingly, defendant Head's motion to suppress the package, the $26,800 in currency which it contained, and all testimony relating to its seizure and contents is denied in all respects.

So ordered.

---

8. See *United States v. Albarado*, 495 F.2d 799, 806 (2d Cir. 1974).

9. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

10. *Wallis v. O'Kier*, 491 F.2d 1323 (10th Cir.), cert. denied, 419 U.S. 901, 95 S.Ct. 185, 42 L.Ed.2d 147 (1974); *United States v. Doyle*, 1 U.S.C.M.A. 545, 4 C.M.R. 137 (1952); *United*

*States v. Florence*, 1 U.S.C.M.A. 620, 5 C.M.R. 48 (1952).

11. *United States v. Edmonds*, 535 F.2d 714 (2d Cir. 1976). See *United States v. Lam Muk Chiu*, 522 F.2d 330 (2d Cir. 1975); *United States ex rel. Muhammad v. Mancusi*, 432 F.2d 1046 (2d Cir. 1970).