**Bill WILKINSON and James Farrands**

**v.**

**Lester FORST, Donald Long, Austin McGuigan and the City of Meriden.**

**Civ. No. H–80–755(JAC).**

United States District Court,
D. Connecticut.

Aug. 22, 1986.

See also, 591 F.Supp. 403 (D.Conn.1984) and 639 F.Supp. 518 (D.Conn.1986).

Matthew Horowitz, Springfield, Mass., Shelley White, Hartford, Conn., for plaintiffs.

Stephen J. O'Neill, Richard T. Biggar, Office of Atty. Gen., James J. Szerejko, Hartford, Conn., for defendants Forst and Long.

Scott J. Murphy, Carl Schuman, Office of Chief State's Atty., Wallingford, Conn., for defendants McGuigan and City of Meriden.

## MEMORANDUM SUPPLEMENTING ORAL RULINGS ON MOTION FOR STAY AND MOTION FOR RELIEF FROM JUDGMENT

JOSÉ A. CABRANES, District Judge:

On August 19, 1986, following an evidentiary hearing at which both sides presented the testimony of witnesses, the court denied the defendants' Motion for Stay of Proceedings Pending Appeal (filed July 30, 1986) and Motion for Relief From Judgment (filed Aug. 11, 1986), in a ruling read from the bench. This memorandum supplements the oral ruling of August 19, 1986.

The previously published decisions in this case, 591 F.Supp. 403 (D.Conn.1984) (*Wilkinson I*), 639 F.Supp. 518 (D.Conn.1986) (*Wilkinson II*), did not prevent the defendants from "seeking relief from the prospective effect of [the] decision if future Ku Klux Klan ('Klan') rallies depart so substantially from past rallies as to suggest that order can no longer be maintained without the use of more intrusive measures [,]" *Wilkinson II* at 531. The court assumes for the argument that, despite the pendency of an appeal of its June 30, 1986 order of injunction, it might, in some circumstances, modify that order to permit the defendants to undertake the suggested "magnetometer" searches. *See* Letter from Lieut. John J. Rearick to Assistant State's Attorney Carl Schuman, (dated Aug. 6, 1986), *attached to* Defendants' Memorandum In Support of Motion for Relief From Judgment (filed Aug. 11, 1986). *But see* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Relief from Judgment (dated Aug. 18, 1986) at 2–7, 13–15 and authorities cited therein. The court also assumes for the argument that the proposed search of all persons attending the East Windsor Klan rally by the use of magnetometers is less intrusive than the universal "pat-down" body search that the defendants would prefer to undertake.

1. At the August 19, 1986 hearing, the defendants indicated they would produce evidence that the projected August 30–31, 1986 rally in East Windsor, Connecticut presented circumstances substantially different from those of the earlier Klan rallies that were the subject of the original trial before the court. *See Wilkinson II* at notes 6 to 13 and accompanying text. The evidence presented by the defendants at the hearing, however, simply does not support a finding that the East Windsor rally "depart[s] substantially from past [Klan] rallies [in Connecticut]." Nor does the evidence presented at the hearing of August 19, 1986 indicate that the court's findings of fact in *Wilkinson II* were erroneous in any particular respect. The East Windsor rally is expected to attract at most about 75 Klansmen and it is to be held on the private property of one Edwin Thrall. In view of the availability of other crowd-control techniques, discussed below, no persuasive evidence was presented at the August 19, 1986 hearing to support a finding that indiscriminate searches of persons and automobiles at this rally are necessary in order to prevent violence—or that there is a justification for a modification of the June 30, 1986 order to permit the less intrusive, but equally indiscriminate, magnetometer search of all persons attending the rally.

▇▇▇ In other words, it may indeed be arguable in the abstract that a magnetome-

ter search of all persons attending a particular political rally can withstand constitutional scrutiny. For instance, such searches might be warranted if the threat of violence at a particular rally was so clear and substantial that use of more conventional law enforcement mechanisms, including those noted below, would be unlikely to succeed in maintaining order and ensuring the public safety, or if the evidence demonstrated that a large group of people might be jeopardized in some extraordinary way. *See, e.g., United States v. Albarado,* 495 F.2d 799 (2d Cir.1974) (threat posed by hijackers and terrorists to air travelers). However, the evidence presented in this particular case, and the record of available alternative law enforcement measures, does not support a decision to permit such searches in the absence of "specific and articulable" facts to support a reasonable belief that a particular individual poses a threat to public safety, *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968), or probable cause to believe that the individual is violating the law (including, for example, the state court ban on the possession of weapons at the rally).

The court previously found that there have been no violent incidents at any Klan rally held in Connecticut involving the use of weapons such as those that might be detected through the use of magnetometers. In fact, the only violent incidents to occur at any Connecticut Klan rallies took place at the first three rallies. These incidents involved fists, rocks and bottles; they were not initiated by Klan members, nor did Klan members participate in them. Moreover, those incidents were substantially attributable to the failure of law enforcement officials to use appropriate crowd-control techniques. *See Wilkinson II,* at notes 40 to 55 and accompanying text. The court has found that the adoption of such techniques at later rallies markedly improved police performance. *Id.* at notes 52 to 56 and accompanying text; *see also id.* at 531. At the hearing of August 19, 1986, the defendants produced no persuasive evidence that there was any greater risk of violence at the August 30–31, 1986 rally than at previous Klan rallies held in Connecticut. Accordingly, the circumstances in this case have not changed substantially since *Wilkinson II,* and there is therefore no basis for modifying the injunction entered at that time.

The Court of Appeals has noted that "[e]ven the unintrusive magnetometer walk-through is a search in that it searches for and discloses metal items within areas most intimate to the person where there is a normal expectation of privacy." *United States v. Albarado, supra,* 495 F.2d at 803 (citation omitted). Indeed, in describing the airport magnetometer searches, the Court of Appeals has observed that "[e]ach aspect of the procedure is ... a search within the meaning of the fourth amendment." *Id.* The airport magnetometer search procedure, like the magnetometer search procedure contemplated in this instance by the defendants, is "carried out upon each and every [person seeking entry to a particular site] without a warrant and without probable cause," *id.,* "and is subject to the fourth amendment's requirement of reasonableness [,]" *id.* As the Court of Appeals well noted in *Albarado,*

> The ultimate standard of the fourth amendment on which we must base our opinion ... is one of reasonableness.... And the reasonableness of a search depends upon the facts and circumstances ... of each case.... Our inquiry ... must be directed to the basic issue whether in the totality of circumstances ... a search is reasonable.

*Albarado, supra,* 495 F.2d at 804 (citations omitted). No judicial authority has been brought to the court's attention which authorizes the indiscriminate use of magnetometers to screen all persons attending a political rally, over the objections of the conveners of the rally. The existence of an unchallenged court order banning weapons from the vicinity of the rally site does not provide a basis for a search that would otherwise be dubious, any more than the existence of a statutory weapon ban (*e.g.,*

New York City's Sullivan Law) would authorize a political subdivision to require magnetometer "pass through" searches of all citizens.

■ 2. It is well worth noting, however, that nothing in the court's various rulings of June 30, 1986 and August 19, 1986 in any way restricts or inhibits the defendants' ability to use other crowd-control techniques with which state and local police officials are now fully familiar, including enforcement of a state court order (secured, indeed, with the consent of the plaintiffs) banning weapons within 3000 feet of the rally site; court-ordered public notice of the weapons ban; a strong and visible police presence; and the separation of Klan forces from anti-Klan forces (by restricting each group to designated areas of the rally site). *See Wilkinson II* at notes 51 and 55 and accompanying text. In addition, the defendants may conduct weapons searches of individuals as to whom there is probable cause to believe that they are carrying weapons or that they are otherwise violating the law (including the state court's order on weapons).[1] Moreover, although the court has not been called upon to consider the issue, "[q]uestioning of all oncoming traffic at roadblock-type stops[,]" *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979) and, in particular, questioning persons with regard to compliance with the state court's order banning weapons from the vicinity of the rally site, may be permissible. If lawful questioning were to present law enforcement officers with "specific and articulable" facts to support a reasonable belief that a particular individual posed a threat to public safety, *Terry v. Ohio, supra*, 392 U.S. at 21, 88 S.Ct. at 1879–80, or probable cause to believe that that individual was violating the law (including the state court order banning weapons), the officers would, of course, be entitled to conduct an appropriate search, including a "pat-down" search.

The findings above, and those included in the oral ruling of August 19, 1986, are entered pursuant to Rule 52, Fed.R.Civ.P.

---

1. It is noteworthy that the defendants have deliberately avoided seeking a warrant to search the premises or person of Edwin Thrall, the one person whose public statements suggest the existence of probable cause to believe that he is violating the law or intends to violate the law, *see* Transcript of State Court Proceedings (August 12, 1986) at 5–9 and Transcript of Federal Court Proceedings of August 19, 1986, while seeking this court's imprimatur for indiscriminate searches of persons as to whom no such probable cause exists.