**Ex parte Cecil W. BAIN**

**Ex parte Thomas M. THURMOND.**

**No. 58595.**

Court of Criminal Appeals of Texas, En Banc.

July 19, 1978.

John E. Clark and Earle E. Cobb, Jr., San Antonio, for appellant.

No appearance for the State.

## ORDER

ONION, Presiding Judge.

On this the 19th day of July, A. D., 1978 came on to be heard the application for writ of habeas corpus by petitioners Cecil Bain and Thomas M. Thurmond. Petitioners, who are San Antonio attorneys, contend they are being unlawfully restrained of their liberty by the respondent, Judge John G. Benavides, Judge of the 187th District Court of Bexar County, who has "designated" and ordered them subject to contempt proceedings, to represent one James Buffington in a capital murder case, without being retained by Buffington or appointed by the court to represent the defendant, and thus would be required to serve without compensation.

They contend the court's order is based on evidence indicating that they had received adequate legal fees from Buffington for civil and other legal services not connected with the capital murder charge.

Petitioners argue that there is no justification for the trial court to use its contempt powers to order them to represent Buffington without compensation; that such action violates their rights under the Thirteenth and Fourteenth Amendments, United States Constitution, and Article I, §§ 3 and 19 of the Texas Constitution. They complain the threats of contempt to compel their compliance with the court's order deprives them of their liberty and property without due process of law, and the court is exercising control on them causing them to devote their time and resources to the prep-

aration and defense of a capital murder case wholly without compensation, and that such order was entered without authority.

The petitioners further claim a violation of the equal protection clause of the Fourteenth Amendment as they are required to perform legal services in a capital murder case without being retained (a) by a client or (b) appointed pursuant to a statute to represent an indigent client who is entitled to legal services at no expense to himself. Petitioners assert they have been singled out by respondent for unique and punitive treatment, and they are without any other effective remedy to regain their "liberty" and prevent further violation of their rights except by writ of habeas corpus.

Petitioners note that on October 10, 1977 petitioners sought relief by application for writ of mandamus filed in the Supreme Court of Texas. On October 26, 1977, without a hearing, the Supreme Court declined to consider said application.

"The writ of habeas corpus is intended to be applicable to all . . . cases of confinement and restraint, where there is no lawful right in the person exercising the power, or where, though the power in fact exists, it is exercised in a manner or degree not sanctioned by law." Article 11.23, V.A.C.C.P.

Article 11.22, V.A.C.C.P., defines "restraint" as:

". . . the kind of control which one person exercises over another, not to confine him within certain limits, *but to subject him to the general authority and power of the person* claiming such right." (Emphasis added.)

█ The record before us reflects that after petitioners' "designation" as counsel for Buffington they announced "not ready" at a trial setting and were immediately held in contempt of court, taken into custody, and held until they made bail pending a hearing before another judge. They were later purged of contempt only when they agreed to prepare for the defense of Buffington, but they expressly reserved their objections and exceptions to the court's earlier orders.

We conclude that if the facts asserted by petitioners are true the respondent's order constitutes a "restraint" within the scope of habeas corpus relief, *Basaldua v. State,* 558 S.W.2d 2, 5 (Tex.Cr.App.1977), and falls within our habeas corpus jurisdiction, Article V, § 5, Texas Constitution, regarding criminal law matters as the complained of order was entered in a criminal case.

Petitioners have brought forward with their pleadings the transcription of the court reporter's notes of the hearing on Buffington's affidavit of indigency on July 29, 1977, at which time the complained of order was entered, and the transcription of the court reporter's notes at the hearing on the motion to vacate the July 29th order, which hearing was conducted on September 9, 1977, and which motion was denied.

The record at such hearings reflects that Buffington's wife was killed in March, 1976. A few days later the husband of Buffington's secretary (an attorney) referred Buffington to petitioner Bain, who appeared with Buffington at the police station on two occasions. It is not clear whether Buffington was a suspect or whether the investigation had begun to focus on him. Sometime in April, 1976 petitioner Thurmond was employed by Buffington to collect the proceeds from certain life insurance policies on the life of Buffington's wife and act as attorney for the three minor Buffington children in the collection of certain insurance proceeds on their mother's life. He was employed to do some corporate work concerning difficulties Buffington was having with his business partner, as well as "some outside problems." Thurmond related his law firm had a contingency fee contract with Buffington for collections of the insurance proceeds which provide for 25% of the proceeds if collected without litigation and 33⅓% of the proceeds if collected after litigation. The record shows Thurmond collected $229,621.00 for the minor children in insurance proceeds without litigation, and that the law firm of which petitioners are members received $23,301.00 as "reasonable attorneys' fee" approved by the probate court. Thurmond

related the fee had been cut to 10% of the proceeds as a matter of fairness. It also appears that Thurmond collected $139,-000.00 in insurance proceeds from policies where Buffington was the beneficiary. For this and other civil law work, Thurmond received from Buffington $9,900.00 in legal fees. An additional $75.00 was charged for securing an order from the probate court allowing a change in the nature of the certificates of deposit taken out for the children.

Petitioner Bain testified that he received a $6,250.00 from Buffington for legal services rendered. While Thurmond described his work as involving civil law matters and that Bain's work involved criminal law matters, Bain invoked the attorney-client privilege when asked what services had been rendered. Both Bain and Thurmond testified, however, they had not been paid "in this criminal case." Buffington testified he had paid Bain some $6,000.00 but that it was not for "this criminal matter" and had paid Bain "nothing" on this case. There are indications in the record Buffington has other pending criminal matters. It would thus appear that petitioners' law firm received $16,225.00 for work done for Buffington and $23,301.00 for collecting the insurance proceeds for the minor children, or a total of $39,526.00.

On March 1, 1977 the record reflects that Buffington terminated the services of Thurmond and Bain. In a letter to Thurmond, he directed Thurmond to turn his civil files over to attorney Pepos Dounson and in a letter to Bain instructed him to turn his criminal files over to attorney Al Hernden. On May 18, 1977, over two and a half months after the services of the petitioners were terminated, Buffington was indicted for the capital murder of his wife, who had been killed in March, 1976.

The record shows that attorney Charles Campion appeared with Buffington before the grand jury, and attorney Alan Brown appeared with him when he surrendered at the sheriff's office and appeared with him at arraignment on May 26, 1977. Buffington testified he did not pay Campion or

Brown anything, but had paid Al Hernden $1,000.00 and Campion and Brown were associates of Hernden. On June 3, 1977 Brown was allowed to withdraw as counsel. On June 7, 1977 attorney Sam Bashara, retained by Buffington, filed an application for writ of habeas corpus to set bail. From June 16 to June 21, 1977 the court conducted a hearing on said application and denied bail. Buffington testified he paid Bashara $3,700.00 to represent him at such hearing, although Bashara testified it was $1,700.00. On July 15, 1977 the court conducted a pre-trial hearing on the State's motion to appoint a psychiatrist and for Buffington to disclose the name of his retained counsel for the trial on the merits. Attorney Bashara was present, as well as attorney James R. Bass, who was handling civil matters for Buffington at the time. Later that day the court learned that Buffington had earlier filed an affidavit of indigency and on July 22, 1977, the court "designated" petitioner Bain to represent Buffington in a hearing on the State's motion to contest the indigency affidavit.

As to his indigency, Buffington testified he had been in jail since May 18, 1977, had no income and that his relatives had no money to help him. He related he had $8.00 to $10.00 in the jail property room, that he had three checking accounts with $1.00 to $3.00 in each account, that he had two bank accounts in the name of Jim's Fence Co., Inc., one with $50.00 in it and another with $14.00. He acknowledged he had corporate stock in Jim's Fence Co., but its market value was "nothing" as the business was no longer in operation. He stated he owned no motor vehicle or boat, but did have personal property consisting of watches, rings, tie clasp, lapel pins, etc., of the value of $500.00 to $600.00, that he owned no real estate except one and a half burial lots of the value of $1,500.00 to $2,000.00.

Buffington testified he had two outstanding judgments against him, one in the amount of $17,500.00 in favor of Ray Council, a former business partner, and one in the amount of $6,500.00 in favor of Frost

National Bank. He related he had various debts at several stores, and that the trust account set up by attorney Bass was "in the hole" $400.00.

He admitted that on June 23, 1976 he had received $139,000.00, but when asked what had happened to the money, he replied, "It was spent." In addition to the money paid to the various attorneys, he stated some of the money was invested "in business," but did not give any amount so invested. He did state that he had purchased an $80,-000.00 to $90,000.00 house, making a down payment of $23,000.00, and that he had also purchased $17,000.00 to $18,000.00 worth of furniture in the house. He stated, however, that the ownership of the house was transferred to his minor children, which transfer or sale was approved by the probate court, and that he had also transferred his interest in the furniture and other accessories in the house to the children.

Buffington related that he had given his girlfriend, Linda Morey, a $6,000.00 diamond ring in December, 1976, a $1,400.00 to $1,500.00 mink stole, and $1,100.00 1976 tax refund check to be used for a honeymoon. They were married the day Buffington was placed in jail, but the marriage was annulled and Morey retained the property she had received.

It was shown that after Buffington was jailed he hired attorney Bass to handle his civil affairs and that Bass had represented him in the annulment suit and certain other law suits.

Bass was paid $8,000.00 to $9,000.00, and Bass testified that he also acquired from· Buffington for legal services rendered a second lien note on the house Buffington owned at the time of his wife's death for $2,400.00 at 7% interest payable at $50.00 per month and an unsecured promissory note of $1,650.00 of David Chasen payable to Buffington at $35.00 per month.

Attorneys Alan Brown and Pat Priest testified that $25,000.00 would be a reasonable fee for a capital murder case, while attorney Sam Bashara stated a "minimum level" fee would be $20,000.00.

At the conclusion of the hearing on July 29th the respondent found Buffington not to be indigent and not entitled to appointed counsel but nevertheless "designated" petitioners Bain and Thurmond to represent Buffington on the capital murder charge as they had been paid $44,000.00 and had been adequately compensated "in this case."

On August 9, 1977 a motion to vacate the order of July 29th was denied. On September 9, 1977 a hearing was conducted on a new motion to vacate the July 29th order, at the conclusion of which the motion was denied. However, the respondent judge noted he was "reoffering" to furnish a free investigator, free expert testimony, a free transcript of any hearing, and to appoint counsel on appeal, if there was a conviction.

Thereafter in October, the petitioners unsuccessfully sought relief from the Supreme Court of Texas, which has been earlier noted. On November 7, 1977, when the capital murder case was called for trial, the petitioners were held in contempt by the respondent when they announced "not ready." They were released from custody on bail pending a hearing before a disinterested judge. On November 22, 1977 the respondent ordered the petitioners purged of contempt, as they agreed to prepare the defense, although through their attorney they expressly did not waive the objections and exceptions to the earlier orders of the court.

The capital murder case was reset for February 6, 1978 and continued for several reasons and set again for May 15, 1978, prior to which time the petitioners brought this application for writ of habeas corpus, and was reset for a trial date in September, 1978 due to the surgery performed on petitioner Bain.

In reviewing the record, we find that the respondent judge was mistaken in finding that the petitioners had been retained and paid $44,000.00 "in this case." The evidence shows that the petitioners received $39,-526.00 from Buffington, the bulk of which was for civil law work done, and that the petitioners had been paid nothing for the capital murder case. In fact, their services

were terminated some two and a half months prior to indictment. Thus, we are not confronted with a situation where retained counsel has already received what the court considers an adequate fee, although not all agreed upon, and is refused permission to withdraw as counsel. What we are faced with is a rather unique situation where the trial court "designates" counsel, without being retained or appointed, to serve in a capital murder case because counsel was retained and compensated for performing other legal services for the defendant. We have not found any reported case approaching the factual situation here presented.

 It has long been held in this State that a trial court may not force an accused to accept an attorney if he wishes to waive representation and defend himself. *Webb v. State*, 533 S.W.2d 780 (Tex.Cr.App.1976), and cases there cited. We are not here faced with a situation where an accused desires to represent himself, but if an accused is solvent, he should be given an opportunity to and be required to employ his own attorney or attorneys for the trial for capital murder. See and cf. *Smith v. State*, 513 S.W.2d 586 (Tex.Cr.App.1974).[1] Under such circumstances, the trial court should not force "designated" counsel upon him. Of course, if in fact he is "too poor to employ counsel," then counsel should be appointed and compensated. Articles 26.04 and 26.05, V.A.C.C.P. See also *Williams v. State*, 461 S.W.2d 630 (Tex.Cr.App.1971); *Ex parte King*, 550 S.W.2d 691 (Tex.Cr.App. 1977). It has been observed that there are no standards set out for the guidance of trial judges in determining the actual indigency of a defendant for the purposes of an appeal, and that each case must be decided upon its facts. *Ex parte Combs*, 545 S.W.2d 171 (Tex.Cr.App.1977); *Conrad v. State*, 537 S.W.2d 755 (Tex.Cr.App.1976); *Roberson v. State*, 538 S.W.2d 788 (Tex.Cr.App.1976); *Barber v. State*, 542 S.W.2d 412 (Tex.Cr. App.1976). See also *Simmons v. State*, 511

S.W.2d 308 (Tex.Cr.App.1974). The trial court has the authority to conduct an evidentiary hearing at any time during the criminal proceedings to determine the indigency of the defendant if placed on notice of such issue. *Foley v. State*, 514 S.W.2d 449 (Tex.Cr.App.1974). In making the determination of indigency, the statutory wording of Article 26.04, supra, should be considered. An accused may be "too poor to employ counsel" to represent him on the charge pending against him and yet not be completely destitute. An accused may have some available funds, but not enough to secure counsel in view of the nature of the charge pending against him. See and cf. *Ex parte Combs*, supra.

 The question of indigency when raised is to be determined at that time and not based on some prior period of time. See and cf. *Conrad v. State*, supra; *Roberson v. State*, supra.

 While one may have little sympathy for an accused who has squandered his resources or has transferred his interest in property and then claims he is "too poor to employ counsel" to represent him on a serious criminal charge and asks for appointed counsel, this does not justify a trial court imposing upon attorneys, previously retained and compensated for other matters, the duty of representing an accused in a criminal case without appointment and compensation. The respondent judge was without authority to enter the order of July 29, 1977. It is hereby set aside, and the relief prayed for by the petitioners is granted. We need not therefore answer petitioners' other contentions.

We trust that if the capital murder case has been transferred to another district court this order will be honored without the necessity of additional orders of this court.

It is so ordered.

*Estrada v. State*, 406 S.W.2d 448 (Tex.Cr.App. 1966); *Robinson v. State*, 458 S.W.2d 75 (Tex. Cr.App.1970); *Webb v. State*, 533 S.W.2d 780 (Tex.Cr.App.1976).

1. An accused's right to select his own counsel cannot be insisted upon or manipulated so as to obstruct orderly procedure in courts or to interfere with a fair administration of justice.