**Michael R. GIBSON, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 08–95–00148–CR.**

Court of Appeals of Texas, El Paso.

March 21, 1996.

Rehearing Overruled May 1, 1996.

Michael R. Gibson, El Paso, for Appellant.

Jaime E. Esparza, District Attorney, Jose R. Rodriguez, County Attorney, El Paso, for State.

Before BARAJAS, C.J., and LARSEN and McCLURE, JJ.

## OPINION

McCLURE, Justice.

This is an appeal from the trial court's denial of habeas corpus relief. We affirm the judgment of the trial court.

### FACTUAL BACKGROUND

Applicant, Michael Gibson, a Texas attorney practicing in El Paso County, filed an application for writ of habeas corpus in the 168th District Court of El Paso County. Gibson alleged that the Sheriff of El Paso County unlawfully restrains his liberty by requiring him to pass his belongings through an "X-ray" machine, and to walk through a magnetometer,[1] before he is permitted to

---

1. A magnetometer is an electronic metal detector shaped like a door frame through which an individual may be required to walk. When a person having metal on his person equal to or greater than the selected calibration passes through the magnetic field, a warning light or signal is activated.

Its operation is based upon the physical fact that the earth is surrounded by a relatively constant magnetic field composed of lines of flux. Steel and other ferromagnetic metals are much better conductors than the air. As a result, when any such metal moves through an area, nearby magnetic lines of flux are distorted to some degree as they tend to converge and

enter the courthouse. The procedure is similar to that found in airports and federal courthouses throughout the country. Gibson contends that the procedure is an illegal arrest in violation of Texas Code of Criminal Procedure, Articles 14 and 15 and an unlawful restraint in violation of the Fourth Amendment to the United States Constitution and Article I, Section 9 of the Texas Constitution.

The trial court conducted a hearing on Gibson's application on April 28, 1995. Gibson was the only witness to testify at the hearing. The following is a summary of his testimony. Gibson is a private practitioner specializing in the defense of criminal matters, and his practice requires him to enter the El Paso County Courthouse. Every time Gibson enters the courthouse, the Sheriff of El Paso County requires Gibson to "allow an examination of [his] briefcase and other carrying devices containing legal papers and matters pertaining to [his] briefcase and other carrying devices containing legal papers and matters pertaining to [his] clients and inspection of [his] person and [his] belongings to a detention; fully passing through an electronic monitoring device which apparently depicts large items of metal." There is no entry into the courthouse without passing through the metal detectors. The courthouse contains the offices of the county judge, county commissioners, county courts at law, the county attorney, the district attorney, district courts, a justice court, the county clerk, the district clerk, family law associate judges, and "other functionaries," including the courtroom and chambers of this Court. It is therefore impossible for Gibson to conduct his business and represent his clients without subjecting himself to the search in order to gain access to the courthouse. On cross-examination, Gibson admitted that every person who enters the courthouse must pass through the metal detectors. Gibson further admitted that he must pass through similar metal detectors at the federal courthouse located in El Paso

County, but he has not sought a remedy for the federal courthouse.

Gibson requested the trial court to order the Sheriff of El Paso County to cease searching the "personal belongings of Michael R. Gibson each time that he attempts to enter the courthouse, and allow him to enter at will without restriction and without an arrest, as defined in the State Penal Code and/or to make such other lawful arrangements which would alleviate the problem as may be authorized by law and required as a practical matter." The trial court denied relief, and Gibson appealed.

## THE STATE OF TEXAS THROUGH THE DISTRICT ATTORNEY IS THE APPROPRIATE APPELLEE

■ Before reaching the merits of this appeal, we must address a preliminary procedural matter. Gibson filed a "Motion to Strike Brief of State of Texas" alleging that the State has no standing to file a brief because Leo Samaneigo in his capacity as the Sheriff of El Paso County is the appropriate party. Although the El Paso County Sheriff's Department appears to be the governmental entity performing the searches, the procedural posture of this case as chosen by Gibson dictates that the State, represented by the district attorney's office, is the correct appellee.

Gibson chose to file an application for writ of habeas corpus pursuant to Chapter 11 of the Code of Criminal Procedure seeking relief from the alleged unlawful restraint on his liberty. Article 2.01 of the Texas Code of Criminal Procedure provides, in pertinent part:

Each district attorney shall represent the State in all criminal cases in the district courts of his district and in appeals therefrom.... When any criminal proceeding is had before an examining court in his district *or before a judge upon habeas corpus,* and he is notified of the same, and is at the time within his district, he

pass through the metal while seeking the path of least resistance. Such distortions occurring near a 'fluxgate magnetometer' create a signal which can be amplified and calibrated to detect magnetic disturbances.

*United States v. Lopez,* 328 F.Supp. 1077, 1085 (E.D.N.Y.1971).

shall represent the State therein, unless prevented by other official duties. [Emphasis added].

TEX.CODE CRIM.PROC.ANN. art. 2.01 (Vernon Supp.1996).

It is therefore the district attorney's duty to represent the State in this habeas corpus proceeding. Gibson alleges that the phrases "all criminal cases" and "any criminal proceeding" make Article 2.01 inapplicable to this particular habeas proceeding because Gibson is not accused or convicted of a crime. Although he asserts that he brings this habeas proceeding pursuant to Article 11 of the Code of Criminal Procedure, Gibson argues that because there is no crime, this habeas proceeding cannot be a "criminal proceeding" or a "criminal case" subject to Article 2.01.

■ We find that the phrases in question refer not to the status of the applicant, but to the nature of the proceeding. A writ of habeas corpus pursuant to Article 11 of the Code of Criminal Procedure is a criminal proceeding despite its availability to persons not accused of crimes. Article 11 habeas corpus relief has broad availability to applicants. *Ex parte Hargett*, 819 S.W.2d 866, 867 (Tex.Crim.App.1991). Article 11.01 describes the writ as the remedy to be used when "any person," not just a person accused or convicted of a crime, is restrained in his liberty. *See* TEX.CODE CRIM.PROC.ANN. art. 11.01. "Restraint" is further defined as "the kind of control which one person exercises over another, not to confine him within certain limits, but to subject him to the general authority and power of the person claiming such right." TEX.CODE CRIM.PROC.ANN. art. 11.22 (Vernon 1977). The definition encompasses all official restraint and does not limit habeas corpus relief to official restraint exercised pursuant to criminal charges. Thus, the remedy afforded pursuant to Article 11 is not limited to those accused or convicted of a crime. Any person seeking relief from unlawful restraint may proceed under Article 11 of the Code of Criminal Procedure, making the action a criminal proceeding, regardless of whether the applicant is accused or convicted of a crime. Article 2.01 of the Code of Criminal Procedure is therefore applicable to this habeas proceeding brought pursuant to Article 11 of the Code.

Additionally, the State's interest in these proceedings is clear. The Texas Legislature vested the authority to provide and administer a fund for the purpose of courthouse security in the commissioners court of each county. *See* TEX.LOCAL GOV'T.CODE ANN. art. 291.008 (Vernon Supp.1996). According to the Texas Attorney General, these courthouse security funds are in response to recent courthouse violence indicating a need for increased security in the courthouses of this state for the protection of both courthouse personnel and members of the public who visit the courthouses. *See* Op.Tex.Atty Gen. DM–283 (1994). The State, by legislating courthouse security funds, has displayed an interest in providing security to protect courthouses for the benefit of all citizens of Texas.

Gibson brought his application for writ of habeas corpus pursuant to TEX.CODE CRIM. PROC.ANN. art. 11.01 *et seq.* As such, it is a criminal proceeding subject to TEX.CODE CRIM.PROC.ANN. art. 2.01. We conclude that the State, represented by the district attorney's office, is the appropriate party to this habeas corpus proceeding and appeal. Having resolved this matter, we turn to the merits.

## STANDARD FOR HABEAS CORPUS RELIEF

■ An applicant for habeas corpus relief has the burden of proving facts which would entitle the applicant to the relief sought. *Ex parte Kimes*, 872 S.W.2d 700, 703 (Tex.Crim. App.1993). The applicant must establish that he is either "confined" or "restrained." *See Rodriguez v. Court of Appeals*, 769 S.W.2d 554, 558 (Tex.Crim.App.1989) (restraint required before writ relief can be granted); TEX.CODE CRIM.PROC.ANN. art. 11.01. Additionally, the applicant must show that he or she is under the confinement or restraint at the time of the filing of the writ application. *See Rodriguez*, 769 S.W.2d at 558. The applicant must further show that he or she has no other adequate remedy. *Ex parte Groves*, 571 S.W.2d 888, 890 (Tex.Crim. App.1978). Finally, the applicant must show

that the confinement or restraint is unlawful. *See* TEX.CODE CRIM.PROC.ANN. arts. 11.14, 11.23 (Vernon 1977).

### IS GIBSON CONFINED OR RESTRAINED?

▆ "Confinement" or "confined" is defined in Article 11.21 as detaining a person within certain limits. TEX.CODE CRIM.PROC. ANN. art. 11.21. Gibson does not allege that he is confined within certain limits. He therefore is not "confined" for purposes of the statute. Gibson is, however, restrained. "Restraint" is defined as "the kind of control which one person exercises over another, not to confine him within certain limits, but to subject him to the general authority and power of the person claiming such right." TEX.CODE CRIM.PROC.ANN. art. 11.22.

In a habeas corpus context, Texas courts have long applied a broad interpretation of the term "restraint." In *Ex parte Snodgrass,* the Court of Criminal Appeals stated "suffice it to say that any character or kind of restraint that precludes an absolute and perfect freedom of action on the part of [the applicant] authorizes such [applicant] to make application to this court for relief from said restraint." *Ex parte Snodgrass,* 43 Tex. Crim. 359, 65 S.W. 1061, 1062 (1901). Since the Court of Criminal Appeals made that pronouncement at the beginning of this century, Texas courts have continued to broadly construe the term "restraint." *See Ex parte Hargett,* 819 S.W.2d at 867 (restraint found in collateral consequences of conviction due to inability to receive military retirement benefits); *Ex parte Ormsby,* 676 S.W.2d 130, 132 (Tex.Crim.App.1984) (restraint found in collateral consequences of conviction after discharge from probation); *Ex parte Bain,* 568 S.W.2d 356, 358 (Tex.Crim.App.1978) (restraint found in court order compelling attorneys to represent a defendant without compensation).

In this case, Gibson testified that he is prevented from entering the courthouse unless he passes himself and his belongings through the metal detectors. Keeping in mind that TEX.CODE CRIM.PROC.ANN. art. 11.04 requires that "(e)very provision relating to the writ of habeas corpus shall be most favorably construed in order to give effect to the remedy, and protect the rights of the person seeking relief under it," we find that Gibson is restrained in a manner that precludes his "absolute and perfect freedom of action." Thus, Gibson presented evidence sufficient to show that he is "restrained" for purposes of habeas relief.

### WAS GIBSON UNDER THE RESTRAINT AT THE TIME OF FILING HIS APPLICATION?

▆ Gibson bears the burden of proving that he was under restraint at the time of filing his application. *See Rodriguez,* 769 S.W.2d at 558. The State argues that Gibson could not have been under restraint at the time of the filing of his application because the nature of the restraint alleged is not continuous. Gibson is only "restrained," the State argues, when he periodically attempts to enter the courthouse. We agree with the State that in all the cases cited by Gibson, and in all of the cases this court reviewed where restraint was found, the nature of the restraint on the applicant was continuing and ever-present.

We conclude, however, that the evidence at the hearing is sufficient to support a finding that the restraint on Gibson is continuing and ever-present thereby permitting a finding that Gibson was under restraint at the time he filed his application. The restraint Gibson alleges is one preventing him from entering a specific area, the county courthouse, freely. Gibson testified that "(t)here is only one entrance to the building.... All other doors have been locked and closed off. There is no other way to get into the building ... except to pass through and subject myself to the authorities." Gibson further testified that "every citizen, every lawyer, every judge, every D.A., every secretary who attempts to enter the building is subjected to a search of their belongings and their person." There was no controverting testimony. Gibson's testimony is sufficient to establish that the metal detector searches are always in place at any time the courthouse is open for business. Thus, the restraint preventing Gibson from entering the courthouse freely is continuously present despite the

fact that Gibson only physically encounters the restraint on those occasions when he wishes to enter the building. Gibson is never free to enter the courthouse without encountering the restraint. Simply because Gibson is not in constant need of entering the courthouse does not mean that the restraint that excludes him is not constantly in place. Accordingly, we find that the evidence is sufficient to establish that Gibson was under restraint at the time he filed his application.

### DOES GIBSON HAVE AN ALTERNATIVE ADEQUATE REMEDY?

■ The State argues that we should decline to entertain Gibson's appeal because Gibson has other available remedies including seeking relief from commissioners court, or filing a civil rights action based on the allegedly unconstitutional search. We agree that the record fails to establish that Gibson lacks an adequate remedy apart from this habeas action. Habeas corpus is an extraordinary remedy. *Ex parte Groves,* 571 S.W.2d at 890. Ordinarily, an appellate court should not entertain an original application for writ of habeas corpus, or entertain an appeal from denial of relief, where there is an adequate remedy at law. *Ex parte Groves,* 571 S.W.2d at 890; *Guzman v. State,* 841 S.W.2d 61, 65 (Tex.App.—El Paso 1992, pet. ref'd).

■ This rule, however, is not absolute. *Ex parte Groves,* 571 S.W.2d at 890. If the applicant can establish good cause to do so, an appellate court can address an issue on habeas corpus despite existence of another adequate remedy. *See id.* (pretrial habeas corpus remedy appropriate despite adequate remedy by appeal because challenged criminal statute was similar to federal statute ruled unconstitutional, trial and appeal could take years, and immediate decision was necessary for benefit of bench, bar, law enforcement, and other similarly situated defendants); *Ex parte Becker,* 459 S.W.2d 442 (Tex.Crim.App.1970) (habeas corpus remedy appropriate because prompt determination as

to legality of allegedly illegally formed grand jury was necessary inasmuch as the grand jury was then in session returning indictments).

■ As in *Becker* and *Groves,* there is good cause to entertain this appeal. Gibson alleges that the metal detector searches are an illegal restraint because they are in violation of the Fourth Amendment to the United States Constitution and Article 1, Section 9 of the Texas Constitution. When Gibson testified that this allegedly unconstitutional search affects "every citizen, every lawyer, every judge, every D.A., every secretary who attempts to enter the building . . .," he in effect alleged that the metal detector search affects the constitutional rights of every citizen of El Paso County. If Gibson's allegations are meritorious, every person who attempts to enter the courthouse is subjected to an unconstitutional search, and all citizens are under restraint in their freedom to enter the courthouse. These are serious allegations which should be addressed without delay.

■ Further, courthouse security is a current issue of utmost importance. We take judicial notice of recent courthouse shootings in Tarrant and Dallas Counties, and of the more recent bombing of the federal building in Oklahoma City.[2] *See Ex parte Williams,* 870 S.W.2d 343, 347 (Tex.App.—Fort Worth 1994, pet. ref'd); *McCulloch v. State,* 740 S.W.2d 74, 75–76 (Tex.App.—Fort Worth 1987, pet. ref'd) (court of appeals may take judicial notice of facts that are notorious, well known, or easily ascertainable even if not judicially noticed in the trial court); *Lewis v. State,* 674 S.W.2d 423, 426 (Tex.App.—Dallas 1984, pet. ref'd). The recent violence visited upon innocent employees working in, and innocent visitors to, public buildings necessitates a prompt decision as to the legality of the security measures in place at the El Paso County Courthouse. Other remedies available to Gibson could take months, or even years to make their way through the court system. Accordingly, we address the remainder of the issues in Gibson's appeal.

---

**2.** We note with particular sadness that the shooting in the courtroom of the Second Court of Appeals in Fort Worth [Tarrant County] was

perpetrated by an attorney who was dissatisfied with the appellate ruling in his personal divorce and child custody case.

### IS THE RESTRAINT UNLAWFUL?

Although we have determined that a magnetometer search constitutes a "restraint," not all restraints are unlawful. Gibson must prove that the metal detector search required for entry to the El Paso County Courthouse is an unlawful restraint. TEX. CODE CRIM.PROC.ANN. arts. 11.14, 11.23. Gibson alleges that the restraint is unlawful in two ways. First, he argues that the search constitutes an unauthorized arrest pursuant to TEX.CODE CRIM.PROC.ANN. arts. 14 and 15. Second, he claims that the search constitutes an unconstitutional search and seizure pursuant to the Fourth Amendment to the United States Constitution and Article I, Section 9 of the Texas Constitution. We will address each in turn.

### 1. Articles Fourteen and Fifteen of the Texas Code of Criminal Procedure

Gibson argues that the metal detector search subjects him to an illegal arrest each time he attempts to enter the courthouse because the search is conducted without a warrant as required by TEX.CODE CRIM.PROC. ANN. art. 15, and because the search does not fall within any of the exceptions allowing for warrantless arrests found in TEX.CODE CRIM. PROC.ANN. art. 14. There is no doubt that the metal detector searches performed on every person entering the courthouse are performed without a warrant. We need not determine whether the searches meet the standards articulated in Article 14 for a warrantless arrest, however, because we do not find that they constitute arrests subject to Articles 14 and 15.

Gibson asserts that because habeas corpus relief lies for one *"restrained* in his liberty" and because TEX.CODE CRIM.PROC. ANN. art. 15.22 states that "[a] person is arrested when he has been actually placed under *restraint* or taken into custody ...," [emphasis added] a person showing that he is "restrained in his liberty" for purposes of habeas corpus is necessarily also "arrested" for purposes of Articles 14 and 15. We disagree, noting that although the statutes both use "restraint" or "restrained," the words are used in different contexts and the

meaning of these terms for purposes of each statute varies dramatically.

As already noted, "restraint" for purposes of habeas corpus relief, like all terms of the statute, is to be most favorably construed in order to give effect to the remedy, and protect the rights of the person seeking relief under it. See TEX.CODE CRIM. PROC.ANN. art. 11.04. Restraint for purposes of habeas corpus is defined as "any character or kind of restraint that precludes an absolute and perfect freedom of action...." *Ex parte Snodgrass,* 65 S.W. at 1062. The Court of Criminal Appeals has defined whether a person is "actually placed under restraint or taken into custody" for purposes of arrest as occurring when a person's "liberty of movement is restricted or restrained." *Amores v. State,* 816 S.W.2d 407, 411 (Tex. Crim.App.1991). A person's liberty of movement is so restricted when, in view of all the circumstances surrounding the seizure, a reasonable person would have believed that he was not free to leave. *See Chambers v. State,* 866 S.W.2d 9, 19 (Tex.Crim.App.1993) *citing Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Thus, it is clear that simply because the two statutes use similar words ("restraint" or "restrained"), the words are used in a different context and cannot be interpreted interchangeably.

The evidence is not sufficient to show that Gibson is "placed under restraint" as that term is defined for purposes of proving an arrest. There is no evidence that Gibson is coerced or forced to submit to the search rather than simply walking away. There is no testimony in the record that Gibson ever felt his freedom of movement was restricted or that he felt that he was not free to leave the courthouse without submitting himself to the metal detector search. Gibson argues that he is coerced or forced into the search because he is compelled to submit to the search or forego the practice of law. We acknowledge that Gibson, when entering the courthouse, does not consent to the search in the full and generally accepted meaning of that term. The federal courts, in determining similar issues, have held that attorneys are not "coerced" or "forced" to

submit to similar searches at courthouses. Although an attorney's consent to a search may be exacted as the price of entering the courthouse to discharge duties necessary to his or her profession, that price renders consent qualified, rather than non-existent. *See e.g., McMorris v. Alioto,* 567 F.2d 897, 901 (9th Cir.1978). Qualified consent is sufficient for a limited, cursory search such as the one at issue here. *Id.* Gibson therefore fails to show that the metal detector search as practiced at the El Paso County Courthouse constitutes an arrest for purposes of Articles 14 and 15 of the Code of Criminal Procedure. Accordingly, we find that the magnetometer searches are not warrantless arrests in violation of TEX.CODE CRIM.PROC.ANN. arts. 14 and 15.

### 2. United States Constitution

 Gibson alleges that the metal detector searches are illegal because they violate the Fourth Amendment to the United States Constitution, which protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The use of a magnetometer is a "search" within the meaning of the Fourth Amendment. *United States v. Epperson,* 454 F.2d 769, 770 (4th Cir.1972). However, the federal constitution does not forbid searches and seizures; it forbids only those that are unreasonable. *Id.* at 771; *Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 1446–47, 4 L.Ed.2d 1669 (1960). The limits imposed upon search and seizure powers are intended to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals. *United States v. Martinez–Fuerte,* 428 U.S. 543, 553–55, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976). "The warrant procedure is designed to guarantee that a decision to search private property is justified by a reasonable governmental interest. But reasonableness is still the ultimate standard." *Camara v. Municipal Court of the City and County of San Francisco,* 387 U.S. 523, 539, 87 S.Ct. 1727, 1736, 18 L.Ed.2d 930, 941 (1967). Warrantless

searches are per se unreasonable unless the search falls within one of "a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967). It is undisputed that the courthouse magnetometer search of which Gibson complains is a warrantless search. Accordingly, we must determine the reasonableness of the search by balancing the governmental interest in the search against the resulting invasion of privacy. The search must be "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 905 (1968). This reasonableness standard requires that the facts upon which an intrusion is based be capable of measurement against an objective standard. *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979); *Terry v. Ohio,* 392 U.S. at 21, 88 S.Ct. at 1868, 20 L.Ed.2d at 905.

### a. Administrative Searches

 The earliest decisions analyzing the constitutionality of magnetometer searches arose from airport searches. *See United States v. Albarado,* 495 F.2d 799 (2nd Cir.1974); *United States v. Davis,* 482 F.2d 893 (9th Cir.1973); *United States v. Ruiz–Estrella,* 481 F.2d 723 (2nd Cir.1973); *United States v. Clark,* 475 F.2d 240 (2nd Cir.1973); *United States v. Slocum,* 464 F.2d 1180 (3rd Cir.1972); *United States v. Bell,* 464 F.2d 667 (2nd Cir.1972); *United States v. Epperson,* 454 F.2d 769 (4th Cir.1972); *United States v. Kroll,* 351 F.Supp. 148 (W.D.Mo.1972); *United States v. Meulener,* 351 F.Supp. 1284 (C.D.Cal.1972); *United States v. Allen,* 349 F.Supp. 749 (N.D.Cal.1972); *United States v. Lopez,* 328 F.Supp. 1077 (E.D.N.Y.1971). Although the searches have repeatedly been held constitutional, the predicate relied upon to establish the validity of a warrantless search varies among the courts from "general reasonableness" to "consent" to the "stop-and-frisk" rationale of *Terry.*[3] From these

---

**3.** To meet constitutional standards, consent must be proved by clear and positive evidence to be voluntary, unequivocal, specific and freely and

intelligently given rather than resulting from duress or coercion, whether express or implied. *Schneckloth v. Bustamonte,* 412 U.S. 218, 228, 93

early cases, we can glean the appropriate standards for the evaluation of magnetometer searches which are frequently denominated as "administrative searches." The essence of an administrative search is that because it is conducted as part of a general regulatory scheme in furtherance of an administrative purpose, rather than as part of a criminal investigation to secure evidence of crime, it is permissible under the Fourth Amendment, although not supported by a demonstration of probable cause directed to a particular place or person to be searched. *Davis*, 482 F.2d at 908. An administrative search "is never linked with probable cause or the issuance of a warrant. Designed to prevent the occurrence of a dangerous event, an administrative search is aimed at a group or class of people rather than a particular person." *People v. Dukes*, 151 Misc.2d 295, 580 N.Y.S.2d 850, 851–52 (City Crim.Ct. 1992). An administrative search will be upheld as reasonable when the intrusion involved is no greater than necessary to satisfy the governmental interest underlying the need for the search. *People v. Dukes*, 580 N.Y.S.2d at 851–52. In other words, the courts will balance the degree of the intrusion, including the discretion given to the person conducting the search, against the severity of the danger posed. *Id.* The magnetometer requires an absolutely minimal invasion of privacy and "does not annoy, frighten or humiliate those who pass through it." *Albarado*, 495 F.2d at 806. "[T]he use of a

magnetometer to detect metal … is not a resented intrusion on privacy, but, instead, a welcome reassurance of safety. Such a search is more than reasonable; it is a compelling necessity to protect essential air commerce and the lives of passengers. The rationale of *Terry* is not limited to protection of the investigating officer, but extends to 'others … in danger.'" *Epperson*, 454 F.2d at 772. Examples of administrative searches are the use of magnetometers at airports and public buildings, and highway checkpoints.[4]

### b. Airport Searches

■ Airport searches are conducted as part of a general regulatory scheme in furtherance of the administrative purpose of preventing passengers from taking explosives or weapons on board airplanes so as to prevent hijackings. *Davis*, 482 F.2d at 908. The ultimate goal is not to apprehend hijackers but to deter hijackers from attempting to board an aircraft at all. *Id.* "The need to prevent airline hijacking is unquestionably grave and urgent. The potential damage to person and property from such acts is enormous." *Id.* at 910. Thus, although routine searches will inevitably lead to the discovery of contraband and the arrest of perpetrators, this consequence does not alter the essentially administrative nature of the screening process or render the searches unconstitutional. *Id.* at 908.

S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973); *United States v. Como*, 340 F.2d 891, 893 (2nd Cir. 1965); *United States v. Smith*, 308 F.2d 657, 663 (2nd Cir.1962), *cert. denied*, 372 U.S. 906, 83 S.Ct. 717, 9 L.Ed.2d 716 (1963). In determining the legality of a warrantless search under the doctrine of implied consent, the courts have been guided by relevant factors including notice of the impending search; voluntary conduct in consenting to the search; the search was justified by a vital interest; the search was reasonably effective in securing the interests at stake; the search was only as intrusive as necessary to further the interests justifying the search; and the search curtailed the unbridled discretion in the searching officers. *McMorris*, 567 F.2d at 899–900; *United States v. Skipwith*, 482 F.2d 1272, 1275 (5th Cir.1973); *Collier v. Miller*, 414 F.Supp. 1357, 1362 (S.D.Tex.1976). To those courts rejecting the consent theory, requiring an election between flying to one's chosen destination and exercising one's constitutional right to travel is a form of

coercion, however subtle. *Albarado*, 495 F.2d at 807; *United States v. Kroll*, 481 F.2d 884, 886 (8th Cir.1973). To those courts adopting the consent theory, the search is not an absolute bar to travel inasmuch as other means of transportation are available. Thus, in a broad sense, the search is "a governmental effort to protect freedom to travel from private interference, rather than to impede the individual's right to travel." *Davis*, 482 F.2d at 913 n. 59.

4. Checkpoint stops are "seizures" within the parameter of the Fourth Amendment. Fixed checkpoint stops to enable border patrol agents to briefly question occupants of an automobile are constitutional although there is no reason to believe a particular vehicle contains illegal aliens, even if the referral of motorists to a secondary inspection area for questioning about citizenship and immigration status is based largely on ethnicity. *Martinez–Fuerte*, 428 U.S. at 562–63, 96 S.Ct. at 3085, 49 L.Ed.2d at 1116.

 The present antihijacking system evolved over time. "Profiles" and selective investigation came first; plainclothes sky marshals became regular passengers; diplomatic overtures were made to Cuba to eliminate it as a refuge for hijackers.[5] Eventually, technology met the demand and magnetometers, hand-held wand-like metal detection devices and X-ray conveyor belts were introduced. Today, the airport search is quite ordinary and routine. *Albarado*, 495 F.2d at 803. The constitutional challenges which followed the technological developments were not surprising inasmuch as neither component of the airport search— the magnetometer or the frisk—seems to readily fit within any of the traditional exceptions to the warrant requirement. *Id.* at 803–04. The analysis in the airport search cases stems from *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968), which held that the conduct must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures, with the ultimate standard being one of reasonableness. *Albarado*, 495 F.2d at 804. In determining the reasonableness of the search, one must balance the need for the search against the invasion of privacy involved. *Id.* at 805. The scope of the search must be " 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Terry*, 392 U.S. at 19, 88 S.Ct. at 1878. For the preservation of a free society, to be constitutional, a search must be as limited as possible commensurate with the performance of its functions. *Albarado*, 495 F.2d at 806.

**5.** The first hijacking of an American commercial aircraft occurred in 1961. *See* J. Arey, *The Sky Pirates* 49–55 (1972). Hijackings from 1961 through 1972 are chronicled in S.Rep. No. 93–13, 93rd Cong., 1st Sess., at 45–50 (1973). Between 1961 and 1968, hijackings of United States airplanes averaged about one per year; in 1969 there were 40 attempted hijackings, of which 33 were successful. *See Davis*, 482 F.2d at 898, *citing* McGinley & Downs, *Airport Searches and Seizures—A Reasonable Approach*, 41 Ford.L.Rev. 293, 294–97 (1972). Beginning in 1968, representatives of the Federal Aviation Administration, the Department of Justice and the Department of Commerce compiled a "profile" of objective characteristics to identify potential hijackers. *Id.* The first screening procedures required magnetometer and personal searches of only those individuals having "profile" characteristics. *Id.*

*c. Courthouse Searches*

The constitutionality of magnetometer searches at airports having been established, the battle moved to the legality of searches at federal buildings and state courthouses, with the courts recognizing "the high social value that society properly attaches to assuring that a courthouse is a place in which rational reflection and disinterested judgment will not be disrupted by intimations of violence." *Ryan v. County of DuPage*, 45 F.3d 1090, 1095 (7th Cir.1995) (rule prohibiting the wearing of masks in the courthouse promulgated by sheriff charged with the responsibility for the safety and security of the courthouse withstood Fourth Amendment challenge to arrest of litigant violating the rule). As one Texas court noted:

> The nature and threat necessitating airport and courtroom searches is death or serious injury to a number of citizens caused by inherently lethal weapons or bombs.... The courts have relaxed the strictures of the Fourth Amendment in light of the unprecedented violence experienced in these two public areas.... Airport security and courthouse search procedures were implemented only recently in the wake of violence reported in these public areas around the country.

*Collier v. Miller*, 414 F.Supp. 1357, 1362 (S.D.Tex.1976).

More recently, one federal appellate court recognized the staggering statistics:

> The inherent dangers of "[e]mploying a combination of psychological, sociological, and physical sciences to screen, inspect and categorize unsuspecting citizens" was recognized in *United States v. Lopez*, 328 F.Supp. 1077, 1100 (E.D.N.Y.1971). On February 1, 1972, the FAA issued a ruling requiring all air carriers to adopt and implement an acceptable screening system to prevent or deter passengers from carrying sabotage devices or weapons on board. *Davis*, 482 F.2d at 900, *citing* 37 Fed.Reg. 2500–01 (Feb. 2, 1972) (adopting proposed rule 14 C.F.R. § 121.538 in part). In December 1972, the FAA ordered that magnetometer screening of all passengers and searches of all carry-on baggage be instituted by January 5, 1973. *Davis*, 482 F.2d at 901–02, *citing* Department of Transportation Press Release No. 103–72, Dec. 5, 1972.

Regarding the risk of violence in federal courthouses, the U.S. Marshals and Court Security officers have detected 350,000 weapons (knives or guns) since 1987. Moreover, during that same period of time there have been over 2000 threats to the judiciary. U.S. Marshall Service, Court Security Statistics (1993). In 1992, a court security officer and a U.S. Marshall were fatally wounded by a prisoner while escorting him back to the jail from a court hearing at the federal courthouse in Chicago, Illinois.

*Woods v. Thieret,* 5 F.3d 244, 246 n. 1 (7th Cir.1993) (also referencing the violence within the legal profession itself as evidenced by a bloody rampage through a large San Francisco law firm which left eight victims dead).

We review now the cases analyzing courthouse searches in light of the Fourth Amendment prohibition against unreasonable searches and seizures. In *Barrett v. Kunzig,* 331 F.Supp. 266 (M.D.Tenn.1971), *cert. denied,* 409 U.S. 914, 93 S.Ct. 232, 34 L.Ed.2d 175 (1972), the plaintiffs sought an injunction against the inspection by the security force of the General Services Administration of briefcases carried into the United States Courthouse at Nashville, Tennessee. Attorney George Barrett arrived at the courthouse for a hearing in a criminal case and was offered three options: (1) open his briefcase for a visual inspection; (2) leave the briefcase in the custody of an attendant and proceed into the building; or (3) carry the briefcase with him without inspection but accompanied by a security guard. Barrett, joined by other attorneys, brought suit alleging that the inspection procedures violated their individual rights and the rights of their clients whom they represented in the federal district courts. It was uncontroverted that the inspection was made to determine if persons seeking entrance were carrying firearms or explosives; it was also uncontroverted that the guards did not attempt to read the contents of any briefcases or packages. The Court specifically noted that all persons, including attorneys and United States judges, were requested to present their belongings for visual inspection. It then queried:

Once the United States had located offices and courts in its property and issued invitations for the public to enter, has it completely given up its right to protect itself, i.e., its property and employees? Stated in another way, may the government make the right of entry on its property conditional, i.e., on a casual visual inspection of packages, etc.? Reduced to an absurdity, is the United States helpless in protecting its property once it has been opened for the public use?

. . . . .

Because everyone carrying the enumerated parcels is required to have them inspected, the inspection is not accusatory in nature and the degree of insult to the entrant's dignity is minimal. Thus it cannot be said that a finger of suspicion is unfairly or arbitrarily being pointed at an individual as falling within a 'highly selective or inherently suspect' group. *See California v. Byers,* 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971).

The Fourth Amendment to the Constitution prohibits 'unreasonable searches.' But does it prohibit the government from conducting in its buildings casual eye inspections of an individual entrant's packages or briefcases to determine if guns or explosives are present? Can this inspection in light of the interest it seeks to protect be so offensive, or overly broad so as to offend the guarantees of the Fourth Amendment and constitute an 'unreasonable' search? This Court thinks not.

*Barrett,* 331 F.Supp. at 272–74.

Similarly, in *Downing v. Kunzig,* 454 F.2d 1230 (6th Cir.1972), an attorney entered the federal building in Detroit, Michigan, briefcase in hand, for purposes of a hearing in a federal district court. He was told by a security guard that he could not leave the first floor unless he either submitted the briefcase for inspection or left it with the guard until he returned from court. The attorney refused and left the building. He then sought a declaration that the security restrictions constituted an illegal warrantless search in violation of the Fourth Amendment, arguing "that the interference by defendant and his agents with the plain-

tiff's free access to the courts without submitting to an unconstitutional and unreasonable search in violation of plaintiff's rights and in violation of the rights of plaintiff's clients to the security of confidential communications threatens to interfere with the plaintiff's earning of the livelihood and with the substantial business of plaintiff's clients." In this particular instance, federal employees and members of the Detroit Bar Association were allowed to gain unrestricted entrance to the building upon showing identification cards. Taking judicial notice of violent outbreaks across the country and the "consequent dangers and hazards to public property and the Government's officers and employees," the Court noted that the dangers to federal property and personnel were "imminent":

> The Federal Building in Detroit is one of significant importance. It is a ten-story building, housing eleven federal district courts, the offices of congressional and senatorial representatives, the chambers of two members of the Sixth Circuit Court of Appeals, and numerous other federal agencies. Ordinarily of course a person should not have his person or property subjected to a search in the absence of a warrant or probable cause to believe that a crime is being committed. Yet to relax the strictures of this rule in the special circumstances shown to exist in this case can in our view have no undermining effect on the protections afforded by the Fourth Amendment.

*Downing v. Kunzig*, 454 F.2d at 1232–33.

The Court concluded that even assuming that a "search" in the Fourth Amendment sense was actually intended or involved, it was cursory in nature and made for the strictly limited purpose of determining that no explosives or dangerous weapons were transported into the building. To require a warrant before examining the packages of each entrant or to determine as to each entrant the existence of probable cause "would as a practical matter seriously impair the power of government to protect itself against ruthless forces bent upon its destruction." *Id.* at 1233.

Still another attorney challenged the constitutionality of magnetometer searches at the San Francisco Hall of Justice, a seven-story building containing the central offices of the police department of the City and County of San Francisco, the offices of the county district attorney, the offices of the public defender, and the chambers and courtrooms for the criminal divisions of the superior and municipal courts for the County of San Francisco. *See McMorris*, 567 F.2d at 897. McMorris sought damages and declaratory and injunctive relief, alleging that the inspection procedures violated the Fourth and Fourteenth Amendments. The inspections were conducted by city employees of all persons entering the building, other than Hall of Justice employees and peace officers. Anyone activating the device was free to leave without further inspection or questioning. If the individual activated the device a second time, after emptying his or her pockets, he or she would not be admitted without submitting to a pat-down search. Officers also inspected briefcases and packages but were specifically instructed not to examine written materials. Taking judicial notice "that threats of violent acts directed at courthouses have given rise to an urgent need for protective measures," the appellate court recognized that limited searches at sensitive facilities have been designated as "administrative searches" which must be conducted for a purpose other than the gathering of evidence for criminal prosecutions. *McMorris*, 567 F.2d at 899. Attempting to distinguish the airport security cases which found that the magnetometer search was consensual, McMorris argued that he was either compelled to submit to the courthouse search or required "to forego the practice of law and risk being found in contempt of court for failing to appear at those proceedings in which he is attorney of record." *Id.* at 900. Finding that although an attorney's consent to a search is exacted as the price of entering to the courthouse to discharge the duties necessary to his profession, the search was nevertheless consensual. *Id.* at 901.

More recently, a New York court determined that the use of walk-through metal detectors installed at the doors to the family court wing of the Goshen Government Center

Building did not represent an unreasonable search in violation of the Fourth Amendment. In *Legal Aid Society of Orange County v. Crosson*, 784 F.Supp. 1127 (S.D.N.Y.1992), the Court carefully noted the unfortunate but demonstrable need for courthouse security:

Sadly, newspaper headlines record daily our society's growing willingness to do violence against those we live beside, those we do not know, and even those whom we love. Courts, long viewed as bastions of justice and security, now struggle against the same violence that invades our schools, roams our streets, and tears at the very fabric of our society threatening to rip it apart. In no small way, this case concerns an ongoing attempt by a court to reclaim the security central to its ability to dispense justice to those passing through its marbled corridors. Today, these corridors are often guarded by a magnetometer, commonly known as a walk-through metal detector.

*Crosson*, 784 F.Supp. at 1128.

Recognizing that family courts are viewed as having greater potential for violent outbursts due to the highly personal and emotional issues involved, the Court emphasized that the need to protect family courts "from the very real potential for violent incidents more than justifies the use of magnetometers. The emotional stresses of divorce proceedings, custody fights, incidents of child abuse, domestic violence, and criminal sentencings for minors are fertile ground for violent incidents in family court." *Id.* at 1130. Discounting the plaintiffs' argument that no serious incidents of violence had occurred at the family court in question, the federal court reasoned that there is no "need to wait until a tragically violent episode occurs ... before it can institute magnetometer searches." *Id.* at 1131. The Court concluded:

Tragically, the effort today to secure the safety of the public courts resembles a battle. Protecting judicial officers and members of the public from the omnipresent threats of violence that surround our public institutions involves greater security efforts and vigilance than ever before....

If courts cannot secure the safety of its judicial officers and the public inside the courthouse doors, they surely cannot secure justice for society beyond them.

We also note that a newly emerging theme of litigation involves allegations of inadequate courthouse security. *See Dorris v. County of Washoe*, 885 F.Supp. 1383 (D.Nev.1995) (former wife's civil rights action against the county, its commissioners, the sheriff, and a deputy sheriff for inadequate courthouse security giving rise to an assault by her former husband during proceedings to obtain a protective order dismissed as failing to show more than mere negligence); *Salas v. Carpenter*, 980 F.2d 299 (5th Cir.1992) (estate of hostage killed by gunman during Tarrant County courthouse kidnaping brought civil rights action against former sheriff).

### d. Constitutional Analysis

■ We now address whether the State has a legitimate interest in performing the search. We find the State's interest in providing security for the benefit of all persons who enter the courthouse to be legitimate. In support of this finding we again note the recent bombing in Oklahoma City and the shootings at county courthouses elsewhere in Texas. *See McMorris*, 567 F.2d at 900 (threats to security of public building give rise to legitimate state interest in providing security); *Barrett*, 331 F.Supp. at 271 (government has legitimate interest in controlling use, maintenance, and protection of its property); *Downing v. Kunzig*, 454 F.2d. 1230, 1232 (6th Cir.1972) (violent outbreaks across the country and consequent dangers and hazards to public property, government officers, and employees constitute legitimate state interest in protecting public buildings).

We must also determine if the search as practiced at the El Paso County Courthouse is overly intrusive on the individual's Fourth Amendment rights. Gibson testified that he must "submit to a search of his person and belongings by passing said belongings through an X-ray device and ... pass his body through a second device that sounds an alarm if metal objects are detected...." He must also "divest [himself] of items in [his] pockets and to allow an examination of [his]

briefcase and other carrying devices containing legal papers and matters pertaining to [his] clients and inspection of [his] person and [his] belongings ... fully passing through an electronic monitoring device which apparently depicts large items of metal." The evidence shows that the examination of Gibson and his belongings is brief and cursory. Gibson does not dispute that the search is intended to locate metal objects, which might be explosives or weapons, entering the courthouse. Gibson asserts that his confidential papers are inspected, but there is no evidence in the record that there is any personal inspection of the confidential papers. The X-ray machine through which Gibson must pass his papers is, according to Gibson's own testimony, designed to "depict large items of metal," not to facilitate reading of documents. It presents a relatively inoffensive method of conducting a search for weapons. It is much less intrusive than a "pat-down" of Gibson's person or a visual search of his packages. *See McMorris,* 567 F.2d at 900. Gibson's testimony establishes that every person attempting to enter the courthouse is subjected to the same search. The inspection therefore is not accusatory in nature, and the degree of insult to personal dignity is minimal. *See Barrett,* 331 F.Supp. at 274. We find that the cursory metal detector searches conducted at the El Paso County Courthouse present a reasonable method of achieving the State's interest in protecting its property and persons entering that property. Accordingly, we find that the searches are not unreasonable and are permissible pursuant to the Fourth Amendment to the United States Constitution.

### 3. Texas Constitution

Gibson alleges that the metal detector searches are illegal because they violate Article I, Section 9, of the Texas Constitution. Section 9 provides:

> The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches, and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation.

When the Republic of Texas became a state in 1846, it entered the Union with its own constitution. *Heitman v. State,* 815 S.W.2d 681, 688 (Tex.Crim.App.1991). Constitutional analysis predicated upon a state constitution, rather than the federal constitution, has become a developing trend.

Over the past twenty years, state courts have increasingly looked to their own constitutions, rather than the Federal Constitution, in examining the extent of their citizens' liberties. This trend toward what has variously been called 'state constitutionalism' and 'new federalism' has met with broad approval. Numerous commentators and courts, both state and federal, have advocated and applied a method of constitutional analysis wherein the state court may examine its own constitution first to determine whether the right in question is protected. Within the context of such an analysis, a state court can benefit from the insights of well-reasoned and developed federal jurisprudence, but is not compelled to reach identical results.

*Davenport v. Garcia,* 834 S.W.2d 4, 12–13 (Tex.1992). Under this system of federalism, a state is free to reject federal holdings provided the state action does not fall below the minimum standards provided by federal constitutional protections. *Heitman,* 815 S.W.2d at 682. State courts may "rethink" federal decisions to ensure that, when interpreting state constitutions, citizens will have the "double security" that the federal constitution was intended to provide. *Id.* at 687. Until *Heitman,* although the Court of Criminal Appeals had recognized the concept of federalism, it had not chosen to interpret Article I, Section 9 as affording greater protections than the Fourth Amendment. *Id.* at 683. In fact, for more than 150 years, the Court repeatedly recognized that Article I, Sec. 9 of the Texas Constitution and the Fourth Amendment to the United States Constitution are the same in all material aspects, with the two provisions serving "to safeguard individuals' privacy and security against arbitrary invasion by governmental officials." *Heitman,* 815 S.W.2d at 682.

That philosophy changed with the *Heitman* opinion:

> [W]e now expressly conclude that this Court, when analyzing and interpreting Art. I, Sec. 9, Tex. Const., will not be bound by Supreme Court decisions addressing the comparable Fourth Amendment issue. In reaching this conclusion we recognize that state constitutions cannot subtract from the rights guaranteed by the United States Constitution, but they can provide additional rights to their citizens. The decisions of the Supreme Court represent the minimum protections which a state must afford its citizens. 'The federal constitution sets the floor for individual rights; state constitutions establish the ceiling.' *LeCroy v. Hanlon,* 713 S.W.2d [335] at 338 [ (Tex.1986) ].

*Heitman,* 815 S.W.2d at 690.

The Court of Criminal Appeals has recently revisited *Heitman,* noting that while the Court is not bound by Supreme Court interpretations of the federal constitution when interpreting provisions of the Texas Constitution, neither is it bound to be different. *Johnson v. State,* 912 S.W.2d 227 (Tex.Crim. App.1995). Recognizing that Article I, Section 9 was drafted at a time when the Bill of Rights did not protect citizens from state actions and that a right against unreasonable searches and seizures could only be protected by a state constitution, the Court emphasized that the framers of the Texas Constitution selected language for Article I, Section 9 that was "almost identical to the Fourth Amendment." *Id.* Had the framers intended to grant citizens greater protection from state actions than they enjoyed from federal actions, the Texas Constitution could have been drafted to reflect that intent. *Id.* The Court concluded that *Heitman* would not be reversed, nor would there be a reversion to interpreting Article I, Section 9 "in lock-step with the Supreme Court's interpretation of the Fourth Amendment." *Id.* at 234. Instead, it determined that:

> [I]f the Courts of Appeals and this Court decide to raise the ceiling of the freedom of Texas citizens from unreasonable searches and seizures, it will be done by choosing in individual cases to interpret Art. I, Sec. 9 in a manner justified by the facts of the case, state precedent on the issue, and state policy considerations.

*Id.* at 234.

■■■■■ We conclude that the state constitution should be construed consistently with the Fourth Amendment in the facts of this particular case. We note that an analysis of the magnetometer searches is analogous to the "suspicionless searches" discussed in *Higbie v. State,* 780 S.W.2d 228 (Tex.Crim.App.1989) and *State v. Sanchez,* 856 S.W.2d 166 (Tex.Crim.App.1993). A suspicionless search, one which lacks "even an indicia of suspicion"[6] is deemed reasonable when it has met the balancing test set forth in *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). The Court of Criminal Appeals adopted the *Brown* factors in determining the legality of a roadblock checkpoint:

> *Brown* requires that the public interest be balanced against the individual's right to personal security in light of three factors: (1) the state interest involved, (2) the level of intrusion on the individual's privacy, and (3) effectiveness of the procedure used in achieving its stated goal. *Brown,* 443 U.S. at 50–51, 99 S.Ct. at 2640.

*Sanchez,* 856 S.W.2d at 168.

■■ Because of our discussion with regard to the reasonableness of the magnetometer searches under a Fourth Amendment analysis, we conclude that the searches are equally viable under an Art. I, Sec. 9 analysis. In any event, Gibson has failed to provide any substantive analysis and argument in separate grounds on his allegations pursuant to the Texas Constitution. Briefs asserting rights under the Texas Constitution are inadequate if they fail to provide either argument or authority in support of the assertion. *Heitman,* 815 S.W.2d at 690 n. 23; *DeBlanc v. State,* 799 S.W.2d 701 (Tex.Crim.App. 1990); *McCambridge v. State,* 712 S.W.2d 499, 501–02 n. 9 (Tex.Crim.App.1986).

6. *Higbie,* 780 S.W.2d at 234.

## PUBLIC POLICY

Gibson alleges that his duty as an attorney and officer of the court is not addressed to the ethics of protecting the citizenry from the violence of society but to the protection of the citizenry from the government itself. Our duty is to both. We note that the judicial system commands the presence of litigants to appear in the courthouse for hearings and trials, and while a plaintiff or a petitioner voluntarily assumes his or her role, a defendant/respondent does not. The courts compel the attendance of witnesses through subpoena, capias, or bench warrant. We issue summons for jury duty and plead with the public to participate in the jury process; we wield the power to punish those who fail to respond. Contempt of court remains a viable enforcement to those who choose to disregard a duty to appear.

If we demand that the public at large come onto the courthouse premises to participate in the administration of justice, we have a duty to ensure minimal levels of protection during their participation. And while justice should eternally blind itself to differences in race, ethnicity, gender, and economic disparity, it cannot be blind to the reality of potential violence. We recognize that individuals accused of crimes, some heinous, are brought into the courts to attend trial. Gang-related criminal proceedings bring spectators who mingle with jurors in the halls, elevators, and cafeteria, in some instances in a threatening manner.[7] Divorce brings out the worst in every individual; anxiety, emotion, anger, and revenge run rampant. Domestic violence is a recurring theme in criminal and family law cases.

We are thus both troubled and saddened by Gibson's argument that in the absence of a specific threat or a perceivable "clear and present danger" arising from an individual circumstance, no search is lawful or justified. In other words, he suggests that until a specific threat is made toward an individual judge, until a specific trial is targeted for intimidation, or a generic bomb threat is directed toward the building as a whole, we may not employ screening devices. We decline to wait until the tragic death of a liti-gant, witness, juror, attorney, courthouse employee, judge, spectator, member of the press, or an individual merely in the building to transact business before we sanction the use of reasonable security measures.

## CONCLUSION

Having found that any restraint Gibson encounters as the result of the metal detector searches at the El Paso County Courthouse is a lawful restraint, we affirm the trial court's denial of Gibson's request for habeas corpus relief.

---

7. *See, Hernandez v. State*, 914 S.W.2d 218 (Tex. App.—El Paso 1996, pet. filed).